**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE ORACLE CORPORATION | ) | |
| DERIVATIVE LITIGATION | ) | C.A. No. 2017-0337-SG |


**MEMORANDUM OPINION**

Date Submitted: November 7, 2019
Date Decided: December 4, 2019

Joel Friedlander, Jeffrey M. Gorris, and Christopher P. Quinn, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and David A. Knotts, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Brian J. Robbins, Stephen J. Oddo, and Gregory Del Gaizo, of ROBBINS LLP, San Diego, California, *Attorneys for* Lead Plaintiff Firemen's Retirement System of St. Louis.

Elena C. Norman, Richard J. Thomas, and Benjamin M. Potts, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Peter A. Wald, of LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly and Rachel J. Rodriguez, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for* Defendants Lawrence J. Ellison and Safra A. Catz.

Kenneth J. Nachbar, John P. DiTomo, Thomas P. Will, and Corinne R. Moini, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Sara B. Brody and Jaime A. Bartlett, of SIDLEY AUSTIN LLP, San Francisco, California; Matthew J. Dolan, of SIDLEY AUSTIN LLP, Palo Alto, California, *Attorneys for* Defendants Estate of Mark V. Hurd, Jeffrey O. Henley, George H. Conrades, Renee J. James, Leon E. Panetta, Michael J. Boskin, Jeffrey S. Berg, Hector Garcia-Molina, Naomi O. Seligman, Bruce R. Chizen, and H. Raymond Bingham.

A. Thompson Bayliss and E. Wade Houston, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: John W. Spiegel, George M. Garvey, and

John M. Gildersleeve, of MUNGER, TOLLES & OLSON LLP, Los Angeles, California, *Attorneys for* Defendant Evan Goldberg.

Andrew S. Dupre, of McCARTER & ENGLISH, LLP, Wilmington, Delaware; OF COUNSEL: Robert P. Feldman, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, Redwood Shores, California; Christopher D. Kercher, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for* Defendant Zachary Nelson.

Thomas A. Beck, Blake Rohrbacher, Susan M. Hannigan, Matthew D. Perri, and Daniel E. Kaprow, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for* Nominal Defendant Oracle Corporation.

GLASSCOCK, Vice Chancellor

In the cryptozoological division of equity's menagerie are a number of rarae aves and chimeras—some, perhaps, not so chimerical as once thought.[1] One unusual denizen[2] is on display here. A stockholder brought a purported derivative action, alleging that insiders had structured an acquisition unfair to the corporation. The action withstood a motion to dismiss, and the corporation formed a special litigation committee of the board to evaluate the claim. I then stayed the matter for several months, to allow the special litigation committee, assisted by its own counsel, to consider the cause of action. Ultimately, the special litigation committee found that it was in the corporate interest that the cause of action be pursued, and determined that that asset would best be monetized on behalf of the corporation by allowing the original plaintiff to proceed, derivatively.

The corporate asset, the cause of action, was thus returned to the Plaintiff on the corporate behalf. These unusual circumstances present, for consideration here, unusual questions: does the litigation asset transferred by the special litigation committee to the Plaintiff include the documents made available to or relied on by the special litigation committee? If so, to what extent, and subject to what (and whose) privileges?[3] I find that the litigation asset was enhanced by the review of the special litigation committee, and that documents relied on by that committee pertain

---

[1] *E.g. Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019).
[2] *See* n.246, *infra*.
[3] Consideration of these questions results in this far uglier rarity: a 60+ page discovery decision.

1

to the asset and must be available to the derivative Plaintiff as fiduciary for the corporation designated by the special litigation committee, subject to the privileges and immunities that may be raised by the individual Defendants and the special litigation committee in its business judgement. My rationale, in the context of cross discovery Motions, is below.

## I. BACKGROUND[4]

*A. The Parties*

Nominal Defendant Oracle Corporation ("Oracle") is a Delaware corporation headquartered in Redwood City, California.[5] Oracle is a technology company whose offerings include "an integrated array of applications, servers, storage, and cloud technologies."[6] Oracle employs over 135,000 people and its market capitalization exceeds $200 billion.[7]

Defendant Lawrence J. Ellison founded Oracle in 1977, and was Chief Executive Officer until he became Chairman of Oracle's Board of Directors (the "Board") and Chief Technology Officer in September 2014.[8] Ellison also co-

---

[4] The facts, except where otherwise noted, are drawn from the well-pled allegations of the Lead Plaintiff's Verified Second Amended Derivative Complaint (the "Second Amended Complaint" or "Second Am. Compl.") and exhibits or documents incorporated by reference therein. The facts in this Memorandum Opinion are a presentation of those facts necessary to understand the context of the Motions and not a summation of all facts in dispute in this Action.
[5] Second Am. Compl., ¶ 21.
[6] *Id.*
[7] *Id.*
[8] *Id.* ¶ 23.

founded NetSuite Inc. ("NetSuite").[9]  Prior to its acquisition by Oracle, NetSuite

"provided cloud-based financial management and ERP software suites for medium

sized businesses."[10]  According to the Lead Plaintiff's Verified Second Amended

Derivative Compliant (the "Second Amended Complaint"), Ellison owns 35.4% of

Oracle's outstanding stock.[11]  Ellison, through his ownership of NetSuite Restricted

Holdings LLC, held 39.2% of NetSuite's common stock as of September 30, 2016,

when NetSuite was purchased by Oracle.[12]  Ellison received $41,518,534 in total

compensation from Oracle in 2016.[13]

Defendant Safra A. Catz is Oracle's Chief Executive Officer.[14]  Catz assumed

this role in September 2014 after holding various positions at Oracle since 1999.[15]

Catz was a member of the Board at the time of the filing of the original complaint in

this Action.[16]  Catz received $40,943,812 in total compensation from Oracle in

2016.[17]

---

[9] Id. ¶ 36.
[10] Id. ¶ 60.
[11] Id. ¶ 2.
[12] Id. ¶ 23.  The Second Amended Complaint alleges that, when combined with ownership of NetSuite common stock by Ellison's "family members, trusts for their benefit, and related entities, Ellison and his affiliates beneficially owned an aggregate of approximately 44.8% of NetSuite common stock" as of September 30, 2016.  Id.
[13] Id.
[14] Id. ¶ 24.
[15] Id.
[16] Id. ¶ 166.
[17] Id. ¶ 24.

Defendant Estate of Mark V. Hurd is the legal successor to Mark V. Hurd, who was Oracle's Chief Executive Officer until his death in October 2019.[18] Hurd assumed this role in September 2014 and was previously Oracle's President from September 2010 to September 2014.[19] Hurd was a member of the Board at the time of the filing of the original complaint in this Action.[20] Hurd received $41,121,896 in total compensation from Oracle in 2016.[21]

Defendant Jeffrey O. Henley is Oracle's Executive Vice Chairman of the Board.[22] Henley assumed this role in September 2014 and was previously Oracle's Chairman of the Board from January 2004 to September 2014, and Oracle's Executive Vice President and CFO from March 1991 to July 2004.[23] Henley received $3,794,766 in total compensation from Oracle in 2016.[24]

Defendant George H. Conrades is a director of Oracle.[25] Conrades assumed this role in January 2008.[26] Conrades was a member of the special committee created in connection with Oracle's acquisition of NetSuite (the "Special Transaction

---

[18] *Id.* ¶ 25.
[19] *Id.*
[20] *Id.* ¶ 166.
[21] *Id.* ¶ 25.
[22] *Id.* ¶ 26.
[23] *Id.*
[24] *Id.* The Second Amended Complaint notes that "[t]he value of the 400,000 options granted to Henley for fiscal 2016 was not disclosed and is therefore estimated based on the disclosed per option value for options awarded to other Oracle executives on the same day." *Id.* ¶ 26 n.1.
[25] *Id.* ¶ 27.
[26] *Id.*

4

Committee").[27]  Conrades received $468,645 in total compensation from Oracle in 2016.[28]

Defendant Renée J. James is a director of Oracle.[29]  James assumed this role in December 2015.[30]  James was chairman of the Special Transaction Committee.[31]  James received $548,005 in total compensation from Oracle in 2016.[32]

Defendant Leon E. Panetta is a director of Oracle.[33]  Panetta assumed this role in January 2015.[34]  Panetta was a member of the Special Transaction Committee.[35]  Panetta was also a member of the special litigation committee convened to "investigate, analyze and evaluate all matters related to this lawsuit and claims made in [this] action."[36]  Panetta received $424,681 in total compensation from Oracle in 2016.[37]

---

[27] *Id.*
[28] *Id.*
[29] *Id.* ¶ 28.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* ¶ 29.
[34] *Id.*
[35] *Id.*
[36] Mot. to Stay, D.I. 91 ("Mot. to Stay"), ¶¶ 9–10.
[37] Second Am. Compl., ¶ 29.

Defendant Michael J. Boskin is a director of Oracle.[38]  Boskin assumed this position in April 1994.[39]  Boskin received $724,092 in total compensation from Oracle in 2016.[40]

Defendant Jeffrey S. Berg is a director of Oracle.[41]  Berg assumed this position in February 1997.[42]  Berg received $512,398 in total compensation from Oracle in 2016.[43]

Defendant Hector Garcia-Molina is a director of Oracle.[44]  Garcia-Molina assumed this position in October 2001.[45] Garcia-Molina received $425,645 in total compensation from Oracle in 2016.[46]

Defendant Naomi O. Seligman is a director of Oracle.[47]  Seligman assumed this position in November 2005.[48]  Seligman received $440,645 in total compensation from Oracle in 2016.[49]

---

[38] *Id.* ¶ 30.
[39] *Id.*
[40] *Id.*
[41] *Id.* ¶ 31.
[42] *Id.*
[43] *Id.*
[44] *Id.* ¶ 32.
[45] *Id.*
[46] *Id.*
[47] *Id.* ¶ 33.
[48] *Id.*
[49] *Id.*

6

Defendant Bruce R. Chizen is a director of Oracle.[50] Chizen assumed this position in July 2008.[51] Chizen was Oracle's Lead Independent Director until at least September 2016.[52] Chizen received $716,061 in total compensation from Oracle in 2016.[53]

Defendant H. Raymond Bingham was a director of Oracle from November 2002 until March 2017.[54] Bingham received $890,902 in total compensation from Oracle in 2016.[55]

Defendant Evan Goldberg co-founded NetSuite with Ellison and was NetSuite's Chief Technology Officer and Chairman of its board of directors.[56] Before co-founding NetSuite, Goldberg worked for eight years as Ellison's "close engineering lieutenant at Oracle."[57] Goldberg owned over $217 million of equity in NetSuite upon NetSuite's acquisition by Oracle.[58] Subsequent to the acquisition, Goldberg was named Executive Vice President, Oracle NetSuite Global Business Unit.[59]

---

[50] *Id.* ¶ 34.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.* ¶ 35.
[55] *Id.*
[56] *Id.* ¶ 36.
[57] *Id.*
[58] *Id.*
[59] *Id.*

Defendant Zachary Nelson was NetSuite's Chief Executive Officer.[60]  Prior to holding that position, Nelson was Vice President of Marketing at Oracle.[61]  Nelson owned over $88 million of equity in NetSuite as of NetSuite's acquisition by Oracle.[62]

Lead Plaintiff Firemen's Retirement System of St. Louis was a stockholder of Oracle at the time of the conduct described in the Second Amended Complaint and has continuously held Oracle stock since then.[63]

*B. The Origins and Operations of Oracle and NetSuite*

Oracle was co-founded by Ellison, Bob Miner, and Ed Oates in 1977.[64]  The Second Amended Complaint alleges that Ellison has a "cult leader status and control over Oracle," which has persisted even though Ellison passed his CEO title to Catz and Hurd in 2014.[65]

NetSuite was co-founded by Ellison and Goldberg in 1998.[66]  Ellison and Goldberg intended NetSuite to "provide companies with business management software over the internet," and Ellison, through an affiliated entity, provided the capital to start NetSuite.[67]  NetSuite was successful, evidenced by its $1.5 billion

---

[60] *Id.* ¶ 37.
[61] *Id.*
[62] *Id.*
[63] *Id.* ¶ 20.
[64] *Id.* ¶ 38.
[65] *Id.* ¶ 46.
[66] *Id.* ¶ 53.
[67] *Id.*

8

valuation upon its public offering in December 2007.[68] The Second Amended Complaint alleges that Ellison "long viewed NetSuite as his company and planned for Oracle to eventually acquire it."[69]

Part of NetSuite's success was that it provided software services to medium sized businesses "without meaningful competition from large ERP software providers, such as Oracle, SAP and Microsoft."[70] By 2015 these larger providers began to encroach on NetSuite's market, and Oracle, in particular, "was outcompeting NetSuite with its new focus on cloud-based ERP software."[71] For instance, an April 2015 Oracle internal management presentation observed Oracle's increasing competition with NetSuite.[72] A June 2016 analyst report by Cowen and Company stated that Oracle was "the biggest near-term competitive threat" to NetSuite.[73]

*C. Oracle's Acquisition of NetSuite*

On January 15, 2016, the second day of a two-day in-person Board meeting at Ellison's Porcupine Creek estate, Catz led a strategy discussion with Oracle's Board during which Douglas Kehring, Oracle's Chief of Staff, "provided the Board with a verbal overview of a potential acquisition of NetSuite, which management

---

[68] *Id.* ¶ 55.
[69] *Id.* ¶ 54.
[70] *Id.* ¶ 60.
[71] *Id.* ¶ 61.
[72] *Id.* ¶ 62.
[73] *Id.* ¶ 64.

had already code named Napa."[74]  Oracle had an Independence Committee that was "expressly charged with reviewing and approving related party transactions, and . . . review[ing] and assess[ing] any potential conflicts of interest involving Ellison, such as a potential acquisition of NetSuite."[75]  However, the Board allowed Ellison to sit in on this presentation, although he did not participate in the discussion.[76]  No written materials on the potential NetSuite acquisition were provided to the Board and the management proposal "focused solely on the possibility of acquiring NetSuite," with "no discussion of alternatives."[77]  The Board subsequently "directed management to continue to assess the feasibility of pursuing Project Napa" and directed Catz and Hurd "to contact NetSuite to understand if NetSuite would be willing to receive an indication of interest but not to engage in any price discussions or otherwise engage with NetSuite's management."[78]

On January 21, 2016, Catz contacted Nelson via phone and they had what Nelson later described as a "loose, pre-due-diligence exploratory conversation where a price range of $100–125 was discussed."[79]  $100 per share represented a premium of 42% above NetSuite's $70.21 per share price at market close on that date.[80]

---

[74] *Id.* ¶ 69 (internal quotation marks omitted).
[75] *Id.* ¶ 71.
[76] *Id.* ¶ 72.
[77] *Id.* ¶¶ 73–74.
[78] *Id.* ¶ 76 (internal quotation marks and footnotes omitted).
[79] *Id.* ¶ 87.
[80] *Id.* ¶ 89.

On January 27, 2016, Goldberg "arranged a principal-to-principal conversation with Ellison."[81] According to the Second Amended Complaint, "Ellison promised to keep the NetSuite business intact post-closing" and Goldberg "recounts" that "there was a commitment at the highest level of Oracle . . . to maintain the integrity of the NetSuite organization."[82]

Oracle's Board held a meeting on March 18, 2016.[83] The meeting was not attended by Ellison, Henley, Hurd, Bingham, or Seligman.[84] The Board's minutes reflect that Catz reported back on her discussion with Nelson and "gauge[d] whether NetSuite would be willing to consider a potential offer from [Oracle]. Ms. Catz stated that the NetSuite representative had indicated that the NetSuite board would be willing to consider an offer from [Oracle]. Ms. Catz informed the Board that no other terms or details relating to any potential transaction with NetSuite were discussed."[85] At the meeting the Board appointed directors James, Panetta, and Conrades to the Special Transaction Committee, which was empowered to act with respect to the NetSuite transaction.[86] According to the Second Amended Complaint, the "full and exclusive power of the Board" was delegated to the Special Transaction

---

[81] *Id.* ¶ 97.
[82] *Id.*
[83] *Id.* ¶ 101.
[84] *Id.*
[85] *Id.* ¶ 102.
[86] *Id.* ¶ 103.

Committee only with regard to an acquisition of NetSuite, whereas "with respect to alternatives," the "only identified power . . . was simply to evaluate them."[87]

The Special Transaction Committee eventually adopted resolutions to effectuate the acquisition of NetSuite for $109 per share.[88] Moelis & Company LLC ("Moelis"), the Special Transaction Committee's financial advisor, provided a fairness opinion to the Special Transaction Committee at this price.[89] On July 28, 2016 Oracle announced that it would acquire NetSuite for $109 per share, and the transaction closed on November 5, 2016.[90]

### D. The Lead Plaintiff's Original Complaint; Finding of Demand Futility and Denial of Motion to Dismiss as to Ellison and Catz

The Lead Plaintiff filed its original complaint in this Action on July 18, 2017 (the "Original Complaint").[91] In preparing the Original Complaint the Lead Plaintiff relied on documents produced by Oracle pursuant to a demand made under Section 220 of the Delaware General Corporation Law (the "DGCL").[92] The defendants included each of the current Defendants other than Goldberg and Nelson (the "Original Defendants"). The Original Complaint alleged one count of breach of

---

[87] *Id.* ¶ 104 (internal quotation marks omitted).
[88] *Id.* ¶ 148.
[89] *Id.* ¶ 147.
[90] *Id.* ¶¶ 148, 160.
[91] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *9 (Del. Ch. Mar. 19, 2018). Two months before the Original Complaint was filed, another Oracle stockholder had filed a separate Complaint in this Court challenging the same transaction and, on September 7, 2017, I designated the Original Complaint as the operative pleading. *Id.*
[92] *Id.*; 8 *Del. C.* § 220.

fiduciary duty against each of the Original Defendants, alleging that they "push[ed] for and agree[d] to the NetSuite acquisition to benefit Ellison at Oracle's expense."[93]

The Original Defendants moved to dismiss the Original Complaint under Chancery Court Rule 23.1[94] for failure to make a litigation demand on the Board, or, in the alternative, under Chancery Court Rule 12(b)(6)[95] for failure to state a claim upon which relief may be granted.[96]

Under Rule 23.1, I considered whether the Lead Plaintiff had "allege[d] particularized facts showing that demand would have been futile."[97] Because the Lead Plaintiff attacked "a decision approved by a board committee consisting of less than half of the directors who would have considered a demand," I applied the *Rales*[98] test for determining demand futility.[99] In conducting a *Rales* analysis, I first

---

[93] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *9.
[94] Ch. Ct. R. 23.1.
[95] Ch. Ct. R. 12(b)(6).
[96] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *9, *20.
[97] *Id.*
[98] *Rales v. Blasband,* 634 A.2d 927 (Del. 1993).
[99] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *10. I explained the standard for demand futility under *Rales*: "a court must examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations. More specifically, a court must decide whether the plaintiff has alleged particularized facts creat[ing] a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. A board is disabled from considering a demand under *Rales* if at least half of its members are interested in the challenged transaction, lack independence, or face a substantial likelihood of personal liability for the conduct described in the complaint. Demand is not excused simply by allegations of director liability, lest the demand requirement be rendered toothless; instead, the plaintiff must make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Id.* (internal citations and quotation marks omitted).

13

examined whether at least half of Oracle's then-twelve Board members faced a substantial likelihood of liability for the conduct described in the Original Complaint.[100] After finding that the Lead Plaintiff "failed to offer particularized factual allegations supporting a loyalty claim against any of the eight outside directors," I concluded that "a majority of the Board [did] not face a substantial likelihood of liability as to the NetSuite acquisition."[101] I next examined the Lead Plaintiff's second argument regarding demand futility, that "demand [was] futile because a majority of the Oracle Board lacks independence from Ellison, who is plainly interested in the NetSuite acquisition."[102] I found that the Lead Plaintiff had shown that "a majority of Oracle's twelve-person board could not impartially consider a demand," thus excusing demand by the Lead Plaintiff.[103]

In determining that a majority of Oracle's Board could not impartially consider a demand, I began with Ellison and the other inside directors and then analyzed specific outside directors.[104] Ellison, I noted, "is conflicted because he stood on both sides of the NetSuite acquisition, thus, he [could not] impartially consider a demand."[105] I then noted that regarding Catz, Hurd, and Henley—all

---

[100] *Id.*

[101] *Id.* I noted that I "need not decide whether the four inside directors—Ellison, Catz, Henley, and Hurd—committed a non-exculpated breach of duty." *Id.*

[102] *Id.* at *15.

[103] *Id.* at *16.

[104] The Oracle directors who would have been asked to consider a demand were: Ellison, Catz, Hurd, Henley, Berg, Boskin, Chizen, Conrades, Garcia-Molina, James, Panetta, and Seligman. *Id.*

[105] *Id.*

14

senior officers of Oracle—the Lead Plaintiff had "created reasonable doubt" that they "could bring their business judgment to bear in deciding whether to sue Ellison."[106]

In addition to Ellison and the three inside directors, I found that the Lead Plaintiff had cast doubt on the independence of at least three outside directors: Conrades, James, and Seligman. I found that Conrades had "multiple layers of business connections with Oracle" and could "lose his rather lucrative directorship" should he agree to sue Ellison.[107] James sat on the boards of two companies with "significant business relationships with Oracle" and had made clear a "desire to head a major technology company" making it "reasonable to infer that James's career ambitions would weigh heavily on her if she were asked to consider suing Ellison."[108] Finally, Seligman had "several sources of conflicts" including "business and personal relationships with Ellison" and the Original Complaint "alleged with particularity that if Seligman agreed to sue Ellison, she would potentially jeopardize not only her decades-long friendship with Ellison, but also Ellison's willingness to shore up her consulting firm and ensure that she keeps her position on Oracle's

---

[106] *Id.* I observed that "[e]ven if he does not qualify as a controller (a question I need not decide here), Ellison owns a 28% stake in Oracle . . . allegedly maintains a firm grip on Oracle's day-to-day operations, and he has shown a willingness to remove directors and officers who cross him." *Id.*

[107] *Id.* at *17.

[108] *Id.* at *18. I also discussed James' "lucrative" director fees notwithstanding that there were not allegations that such fees were "material to her" but considered the fees "alongside the other allegations bearing on James's independence." *Id.*

board."[109] For these reasons and others explained in more detail in the Memorandum Opinion, I found that "demand [was] futile because the facts alleged raise a pleading-stage inference that a majority of the Oracle board . . . lacks independence."[110] I consequently denied the Original Defendants' Motion to Dismiss under Rule 23.1.[111]

I next considered the Original Defendants' Motion to Dismiss under Rule 12(b)(6). The question in ruling on that Motion was whether "the Plaintiff in this case has stated a non-exculpated fiduciary duty claim against each of the [Original] Defendants."[112] I concluded in the affirmative for Ellison and Catz. As to Ellison, I noted that the Original Complaint "support[s] a reasonable inference that Ellison planned the NetSuite acquisition to benefit himself at the expense of Oracle's other stockholders. Not only did he stand on both sides of the transaction; he also directed his chief lieutenant to manipulate the sale process so that he could monetize his investment in NetSuite before it lost much of its value."[113] Catz "violated the Board's instruction not to discuss price with NetSuite's CEO, and she later concealed her secret negotiations from the other directors. Moreover, Catz allegedly attempted to manipulate the sale process to steer the Special [Transaction] Committee toward

---

[109] *Id*. at *19.
[110] *Id*. at *20. The majority (7 out of 12) were: Ellison, Catz, Hurd, Henley, Conrades, James, and Seligman.
[111] *Id*. at *19.
[112] *Id*. at *20.
[113] *Id*. at *21.

16

Ellison's preferred price range."[114]  I therefore declined to dismiss the Original Complaint as to the allegations against Ellison and Catz at that time.

Rather than ruling on the Motion to Dismiss under Rule 12(b)(6) as to the other eleven Original Defendants, I requested supplemental briefing.  For the insiders—Henley and Hurd—I asked the parties to address whether the Original Complaint stated a claim against Henley and Hurd in their executive capacities.[115]  Additionally, I asked: "[d]o *Cornerstone*[116] and its progeny, including this Court's recent decision in *Cumming v. Edens*,[117] require that this Court deny a motion to dismiss brought by an exculpated director whose conduct fails to give rise to a claim for breach of the duty of loyalty, except insofar she lacked independence as to the challenged transaction?"[118]  I therefore "reserve[d] decision on the balance of the Motion pending supplemental briefing and argument."[119]

On March 28, 2018, I granted an Order under Chancery Court Rule 41(a)[120] dismissing without prejudice the claims against all of the Original Defendants other than Ellison and Catz.[121]  On April 4, 2018, I granted the parties' proposed Order

---

[114] *Id*. at *22.
[115] *Id*. at *23.  Whether the Original Complaint stated a claim against Henley and Hurd in their executive capacities was relevant because, as officers, they "lack the benefit of the exculpation clause for actions taken in their executive capacity." *Id*. at *22.
[116] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015).
[117] 2018 WL 992877 (Del. Ch. Feb. 20, 2018).
[118] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *23.
[119] *Id*.
[120] Ch. Ct. R. 41(a).
[121] Stipulation and Order of Dismissal Without Prejudice, D.I. 79.

denying the Motion to Dismiss in part.[122]  That order conveyed that in the parties' belief the dismissal without prejudice "moot[ed] the Court's request for supplemental briefing."[123]  Ellison and Catz, the only remaining Original Defendants at that time, answered the Original Complaint on May 4, 2018.[124]

*E. The Special Litigation Committee*

On May 4, 2018, Oracle's Board created a special litigation committee (the "Special Litigation Committee" or "SLC") and authorized it to: "(i) take all actions necessary to investigate, analyze and evaluate all matters relating to this lawsuit and the claims made in the action, and (ii) take any actions that the SLC deems to be in the best interests of the Company in connection with this lawsuit and any related matters."[125]  The Board appointed Leon E. Panetta to the SLC and provisionally appointed William G. Parrett and Charles W. Moorman to the SLC.[126]  The SLC retained Kramer Levin Naftalis & Frankel LLP and Potter Anderson & Corroon LLP as its counsel.[127]

---

[122] Order Denying Mot. to Dismiss in Part, D.I. 81.
[123] *Id*. at 2.
[124] Defs. Ellison and Catz's Answ. to Verified Derivative Compl., D.I. 84.
[125] Mot. to Stay, ¶ 9.
[126] *Id*. ¶ 10.  Parrett and Moorman were appointed provisionally because they were not yet members of the Board and their appointment to the SLC was "contingent on their ultimately being approved as Board members and their agreement to serve on the SLC.  Messrs. Parrett and Moorman subsequently were approved as Board members and they agreed to serve on the SLC." *Id*.  Panetta is a Defendant in this Action in connection with the NetSuite transaction.  Parrett and Moorman are not Defendants.
[127] *Id*. ¶ 11.

18

On July 2, 2018, the SLC moved for a stay of all proceedings in this litigation pending the completion of its investigation.[128] In its Motion to Stay, the SLC argued that "[o]nce the corporation has appointed a special litigation committee and empowered it to act, derivative litigation should be stayed for a reasonable amount of time pending the completion of the committee's investigation and the issuance of its conclusion."[129] The SLC cautioned that "unless a stay is entered the dual burdens of cooperating in the SLC's independent investigation and participating in discovery undoubtedly would expend Company resources and impose additional and potentially unnecessary burdens on the Court."[130] The SLC asked for a six month stay, noting that "[a] thorough investigation of the events challenged in this action will at a minimum require the collection and review of relevant documents, interviews with past and present officers and directors, an investigation into the circumstances surrounding the NetSuite acquisition, and the preparation of a report."[131] The SLC offered to provide periodic updates "concerning the progress of its investigation and the expected time of completion."[132] On July 24, 2018, I

---

[128] Mot. to Stay.

[129] *Id.* ¶ 21 (*citing Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del. 1981); *Kaplan v. Wyatt*, 484 A.2d 501, 510 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985)).

[130] *Id.* ¶ 25 (*citing Harbor Fin. Partners v. Sunshine Mining and Ref. Co.*, 1996 WL 74728, at *2 (Del. Ch. Feb. 16, 1996)).

[131] *Id.* ¶ 28.

[132] *Id.* ¶ 29.

granted the SLC's Motion to Stay for six months and ordered the SLC to provide a status report on or before November 30, 2018.[133]

The SLC provided a status report on November 29, 2018.[134] The report noted that to that date, the SLC had "(a) met with Plaintiff's counsel; (b) requested documents from a total of 35 custodians; (c) received and reviewed a substantial number of documents produced by those persons and entities; and (d) interviewed witnesses with knowledge concerning the allegations in Plaintiff's complaint and scheduled additional interviews."[135] The SLC reported that its members "convene on a regular basis to discuss the ongoing investigation."[136]

The SLC noted that in the course of its investigation it requested documents from Oracle, Ellison, and Catz encompassing 46 categories of documents.[137] Oracle originally agreed to produce documents from fourteen custodians, and, after this initial production, the SLC conferred with Lead Plaintiff's counsel and requested (and was granted) documents from additional custodians.[138] Oracle completed its production of documents on November 21, 2018 for requests made to that date,

---

[133] Order, D.I. 93.
[134] Status Report, D.I. 95 ("Status Rep.").
[135] *Id.* ¶ 7.
[136] *Id.*
[137] *Id.* ¶ 10. The document request to Oracle "sought documents and communications of both Oracle and NetSuite." *Id.*
[138] *Id.* ¶¶ 11–14. In its review of Oracle's documents, the SLC "identified seven additional categories of relevant documents and communications" and asked Oracle to produce those additional categories. *Id.* ¶ 18.

including documents from Ellison and Catz.[139]  Up to the date of the status report, Oracle had produced more than 1.1 million documents.[140]

In addition to Oracle, Ellison, and Catz, as of the date of the status report, the SLC had requested documents and communications from sixteen other persons and entities, including: "(i) the nondefendant Oracle directors; (ii) the [Special Transaction Committee]; (iii) the law firms representing both the Special Transaction Committee[141] and NetSuite[142] during the acquisition negotiations; and (iv) the financial advisors retained by the Special Transaction Committee[143] and by NetSuite[144] in connection with the acquisition."[145]  The SLC noted it was still awaiting completion of document production by the non-management Oracle directors and that the only entity that declined to produce documents was T. Rowe Price, a former NetSuite stockholder that objected to the acquisition.[146]

---

[139] *Id.* ¶¶ 15–16.  The SLC separately requested production from the personal accounts and electronic devices of Ellison and Catz.  *Id.* ¶ 16.

[140] *Id.* ¶ 17.

[141] Skadden, Arps, Slate, Meagher & Flom LLP.

[142] Wilson Sonsini Goodrich & Rosati, P.C.

[143] Moelis & Company.

[144] Quatalyst Partners LP.

[145] Status Rep., ¶ 19.

[146] *Id.* ¶¶ 23–24.  The Lead Plaintiff eventually moved to lift the stay for the limited purpose of seeking discovery from T. Rowe Price.  The SLC, in its response to the Motion, submitted a Proposed Order also requesting a lift of the stay, but "permit[ting] it to take the lead in seeking discovery from T. Rowe Price."  Order Lifting Stay for the Limited Purpose of Seeking Disc. from T. Rowe Price Assocs., Inc., D.I. 109, at 1.  The Lead Plaintiff did not object to the Proposed Order but noted that the SLC "represents that it will vigorously pursue the T. Rowe Price discovery" and that "Lead Plaintiff will hold the SLC to that representation."  Letter of February 18, 2019, D.I. 108, at 3.  The Proposed Order was granted on February 20, 2019.  The SLC served a subpoena on T. Rowe Price on May 6, 2019.

The SLC had also begun witness interviews. As of the time of the status report, the SLC's counsel had interviewed "two senior employees of Oracle who have responsibility for marketing Oracle's products and one senior employee of NetSuite who had responsibility before the acquisition for marketing NetSuite's products."[147] The SLC had scheduled upcoming interviews of six witnesses, including "counsel for the Special Transaction Committee, other Oracle Board directors, an Oracle executive, and former NetSuite executives" in the then-coming three weeks.[148]

The SLC also had retained its own financial advisor in connection with its investigation who was "reviewing relevant documents" and "reporting on the implications of those documents."[149] Lastly, the SLC noted that it expected to seek an extension of the six-month stay, which was set to expire on January 24, 2019.[150] It eventually sought this extension, and on December 28, 2018 I granted an extension of the stay until May 15, 2019.[151]

---

[147] Status Rep., ¶ 26.
[148] *Id*. ¶ 27. The SLC expected to additionally interview: "(i) other Special Transaction Committee members; (ii) other Oracle Board directors; (iii) former NetSuite directors; (iv) Oracle employees who prepared the financial models used in connection with the acquisition; (v) the Special Transaction Committee's and NetSuite's respective financial advisors; (vi) other current Oracle executives; (vii) former Oracle and NetSuite executives, and (viii) Mr. Ellison and Ms. Catz." *Id*. ¶ 28.
[149] *Id*. ¶ 31. The status report does not identify the financial advisor.
[150] *Id*.
[151] Stipulation and Order Staying Proceedings, D.I. 97.

*F. The SLC's Motion to Extend Stay*

On May 6, 2019, the SLC moved to extend the stay by an additional ninety days, to August 15, 2019.[152] The SLC noted that it had "engaged in a thorough investigation of the claims at issue" and had determined "that it was in Oracle's interest to investigate whether a settlement of the claims is feasible."[153] The SLC and the then-defendants—Ellison and Catz—agreed to participate in a formal non-binding mediation on July 2, 2019.[154] The SLC asked for the extension so that it would be "afforded a reasonable amount of time to pursue such negotiations."[155]

The Lead Plaintiff supported the requested extension on two conditions: (1) that it be allowed to participate in the July 2, 2019 meditation and (2) that the SLC produce "standard categories of documents supporting the SLC's post investigation determination to pursue settlement negotiations."[156]

On June 7, 2019, I heard Oral Argument on the Motion to Extend Stay.[157] I noted that neither the time frame requested by the SLC nor the proceedings of the

---

[152] Mot. to Extend Stay, D.I. 114 ("Mot. to Extend Stay").

[153] *Id.* ¶¶ 3–4. In support, the SLC noted that it had, in part, "collected more than one million documents from fourteen Oracle and NetSuite custodians; received and reviewed productions of documents from Oracle Board directors and five non-parties; and hired a forensic data consultant to oversee the collection of data from certain custodians' cell phones." *Id.* ¶ 3.

[154] *Id.* ¶ 5.

[155] *Id.* ¶ 8.

[156] Lead Pl.'s Resp. to Mot. to Extend Stay, D.I. 116, ¶ 7. The Lead Plaintiff offered the following as examples of such documents: "any SLC report; SLC meeting minutes; those documents provided to SLC members or witnesses; interview memos." *Id.*

[157] I granted the Motion to Extend Stay on May 13, 2019, and at Oral Argument considered whether, consistent with the Lead Plaintiff's request, I should attach certain conditions on such grant.

23

SLC were "unreasonable."[158] I denied the Lead Plaintiff's request to be a mediation participant and for interim production of SLC documents, but noted to the SLC's counsel that:

> Eventually, your client's going to have to justify what it ultimately does. To the extent that it is considering wrongdoing and things that are going to be recovered for wrongdoing, it's got a partner sitting right across the aisle. To the extent it doesn't view the plaintiff as a partner or treat the plaintiff as a partner, there will inevitably be further litigation.
>
> While I'm not imposing any conditions, I think it would be wise for the special litigation committee to think carefully about how it can accommodate and realize value from the efforts of the plaintiffs as they have proceeded in this matter, and attempt to limit the post-determination litigation and the issues that are going to inevitably be presented.[159]

Thus, the SLC was permitted to continue with the planned mediation without the express conditions advocated for by the Lead Plaintiff.

On July 18, 2019, the Lead Plaintiff moved to lift the stay for the limited purpose of filing an amended complaint. The Lead Plaintiff noted that the SLC had "not yet submitted its report or provided notice to Lead Plaintiff of its position respecting the derivative claims."[160] The Lead Plaintiff expressed concern that it did not know whether the SLC had obtained tolling agreements with "any or all potential defendants" or whether the SLC intended to "allow the statute of limitations to run

---

[158] June 7, 2019 Oral Arg. Tr., D.I. 133, at 26:14–26:24.
[159] *Id*. at 27:4–27:8, 27:10–27:23.
[160] Mot. to Lift Stay, D.I. 134 ("Mot. to Lift Stay"), ¶ 7.

24

on July 27, 2019."[161] The SLC, the then-Defendants, and Oracle did not oppose the Motion or the Lead Plaintiff's filing of an amended complaint.[162] On July 22, 2019, the Lead Plaintiff filed an amended complaint (the "First Amended Complaint").[163] In addition to Ellison and Catz, the First Amended Complaint named as Defendants all of the Original Defendants (Ellison and Catz, along with the other Original Defendants, the "Oracle Defendants") and Goldberg and Nelson (the "NetSuite Defendants").[164] Count I of the First Amended Complaint alleged breach of fiduciary duty against the Oracle Defendants, including against those Original Defendants who were previously dismissed without prejudice.[165] Count II alleged aiding and abetting against the NetSuite Defendants for "knowingly participat[ing] in the breaches of fiduciary duty by Ellison, Catz, and Hurd."[166] The Second Amended Complaint, the current operative complaint, maintains identical counts against identical individuals.[167]

*G. The SLC Allows the Lead Plaintiff to Proceed with this Action*

On August 15, 2019, the SLC's counsel, Potter Anderson Corroon LLP ("PAC") wrote a letter to this Court (the "SLC Letter"). PAC noted that the

---

[161] *Id.* ¶ 8.
[162] Letter of July 22, 2019, D.I. 136, at 1.
[163] Lead Pl.'s Verified Amended Derivative Compl., D.I. 139 ("First Am. Compl.").
[164] *Id.* ¶¶ 20–35.
[165] *Id.* ¶ 147; Stipulation and Order of Dismissal Without Prejudice, D.I. 79.
[166] First Am. Compl., ¶ 151.
[167] Other than Defendant Estate of Mark V. Hurd, which was substituted for Mr. Hurd.

mediation had not been successful and that "it appears unlikely that a settlement can be reached in the near future."[168] It continued: "the SLC has determined that the Lead Plaintiff should be allowed to proceed with the derivative litigation on behalf of Oracle."[169]

The SLC Letter gave as background an overview of the SLC and the conclusions from its investigation. According to PAC, the SLC "conducted a thorough investigation and evaluation of the claims raised in the derivative complaint."[170] After this investigation, it was "the SLC's view that the critical legal issue of whether the challenged NetSuite acquisition will be reviewed under the entire fairness standard would not likely be resolved prior to trial, thereby posing risks to both plaintiff and defendants."[171] "For these reasons," according to PAC:

> the SLC sought to negotiate a settlement that appropriately reflected the potential risks, advantages and disadvantages of further litigation. As noted, those settlement negotiations were not successful. After carefully considering the issues, the SLC concluded that it would not be in Oracle's best interests to seek to dismiss the derivative claims.
> The SLC therefore faced the choice of either pursuing the litigation itself or allowing Lead Plaintiff to proceed on behalf of the Company. After giving the matter careful consideration, the SLC determined it was in the Company's best interests to allow Lead Plaintiff (rather than the SLC) to proceed with the litigation on behalf of Oracle. The SLC, however continues to believe that a settlement of the claims would be the best result for Oracle.[172]

---

[168] Letter of August 15, 2019, D.I. 146 ("SLC Letter"), at 1.
[169] *Id.*
[170] *Id.* at 2.
[171] *Id.*
[172] *Id.*

26

Of the newly-filed claims against the Oracle Defendants and the NetSuite Defendants, the SLC Letter stated that the SLC had completed its investigation by the time the First Amended Complaint was filed, and "in light of its decision to allow Lead Plaintiff to proceed with the claims against Mr. Ellison and Ms. Catz . . . the SLC sees no benefit in attempting to address separately at this time the new claims asserted against the other defendants."[173]

Over the course of the SLC's investigation, Kramer Levin Naftalis & Frankel LLP ("Kramer Levin")—additional counsel to the SLC—notes that the SLC requested documents from seventeen individuals or entities and interviewed forty witnesses.[174] The SLC sent Oracle an initial document request and six subsequent follow-up requests.[175] Oracle produced a total of approximately 1.4 million documents by the end of the SLC's investigation.[176] Kramer Levin does not say how many of the approximately 1.4 million documents it actually reviewed. Many of the documents for which Defendants Ellison and Catz were custodian were produced by Oracle as they were found on Oracle servers or otherwise in its "custody, possession,

---

[173] *Id.*

[174] Aff. of Jason M. Moff, Esq., D.I. 236 ("Moff Aff."), ¶ 3. Among others, Kramer Levin interviewed: Ellison, Catz, Hurd, Henley, other Oracle Directors, all members of the Special Transaction Committee, and all members of the Special Litigation Committee. Moff. Aff., Ex. 14, at 1–2.

[175] Moff Aff., ¶¶ 7, 9. The follow up requests were on October 19, 2018, October 23, 2018, February 21, 2019, March 19, 2019, April 5, 2019, and April 23, 2019. *Id.* ¶ 9.

[176] *Id.* ¶ 10.

or control" but the SLC separately requested document production directly from Ellison and Catz.[177] Kramer Levin "reviewed all the documents produced by Mr. Ellison and Ms. Catz."[178] Kramer Levin additionally "reviewed all the documents and communications" produced by the following: Skadden Arps, Slate, Meagher & Flom LLP (266 documents); Wilson Sonsini Goodrich & Rosati P.C. (8,094 documents); Moelis (4,003 documents),[179] Quatalyst Partners LP (5,789 documents); and the non-management directors at the time of the NetSuite acquisition (164 documents).[180] Kramer Levin showed documents to interviewees over the course of its forty interviews and "documented in memoranda [its] findings, thoughts, and impressions from these interviews."[181] It is unclear from the record whether Kramer Levin or PAC produced a report for the SLC, either in draft or final form.

*H. The Contested Subpoenas*

The Lead Plaintiff's first move in the aftermath of the SLC Letter was the service of identical subpoenas upon the SLC and PAC (each, a "Subpoena," and, together, the "Subpoenas").[182] The Subpoenas requested "[a]ll documents and

---

[177] *Id.* ¶ 11.
[178] *Id.* ¶ 14.
[179] Moelis produced its "deal file" and communications of Dan Lee, Stuart Goldstein, Christopher Foss, Ken Moelis, and Jeff Raich. *Id.* ¶ 17.
[180] *Id.* ¶¶ 15–19.
[181] *Id.* ¶ 24. The forty interviews included thirty four different interviewees. Moff. Aff., Ex. 14.
[182] Notice of Service of Subps., D.I. 167.

28

communications produced to, or obtained, reviewed, considered, created or prepared by or for the Special Litigation Committee, and all documents and communications concerning this Action or the Special Litigation Committee."[183]  This includes all documents and communications (i) "concerning any actual, proposed or prospective action or meeting, formal or informal, of the Special Litigation Committee" and (ii) "obtained or reviewed by the Special Litigation Committee including, but not limited to, those obtained from Oracle, Defendants, Netsuite, the Special Transaction Committee, Moelis, Qatalyst, Skadden Arps, Wilson Sonsini, and/or T. Rowe Price."[184]  The Subpoenas also requested "any draft or final report prepared by the Special Litigation Committee."[185]  Other categories of documents and communications within the scope of the Subpoenas' request were also listed.

Both the SLC and PAC served their responses and objections to the Subpoenas on September 11, 2019.[186]  In its general objections, the SLC argued that "the Subpoena is objectionable in its entirety."[187]  The SLC noted that because it permitted the Lead Plaintiff to proceed with the litigation, there is "no need for either

---

[183] Subp. Duces Tecum Served on The Special Litig. Comm. of the Bd. of Dirs. of Oracle Corp., D.I. 167 ("SLC Subpoena"), at 15–16; Subp. Duces Tecum Served on Potter Anderson & Corroon LLP, D.I. 167 ("PAC Subpoena"), at 15–16.
[184] SLC Subpoena, at 16; PAC Subpoena, at 16.
[185] SLC Subpoena, at 17; PAC Subpoena, at 17.
[186] Notice of Service of (1) The Special Litig. Comm.'s Responses and Objections to Pl.'s Subp. Duces Tecum and (2) Potter Anderson & Corroon LLP's Responses and Objections to Pl.'s Subp. Duces Tecum, D.I. 174.
[187] Lead Pl.'s Mot. to Enforce Subps, D.I. 203 ("Lead Pl.'s Mot. to Enforce Subps."), Ex. E ("SLC's Responses and Objections"), at 1.

the Court or the parties to address or evaluate the SLC's independence, investigation, or determination" and thus "discovery of the SLC in this context is inappropriate and unnecessary."[188] The SLC also raised the issue of privilege, accusing the Subpoena of "improperly seek[ing] the production of privileged material, including but not limited to communications between the SLC and its counsel, work product, and mediation submissions."[189] The SLC contended that it was not authorized by third parties to disclose any documents produced to it in connection with its investigation and that the Lead Plaintiff is "able to obtain the documents directly from those parties and third-parties, who in turn will have the opportunity to raise any objections or assert any privileges they may believe to be appropriate."[190] PAC responded to its Subpoena with identical general objections.[191]

On October 17, 2019 Oracle's Board passed a written consent withdrawing the power and authority of the SLC to "take any actions to investigate, analyze, or evaluate matters relating to [this litigation] and the claims made in [this litigation] or (ii) take other action on behalf of [Oracle] in connection with [this litigation] or related matters."[192] However, the written consent authorized and empowered the

---

[188] SLC's Responses and Objections, at 1–2.
[189] *Id.* at 2.
[190] *Id.* at 2.
[191] Lead Pl.'s Mot. to Enforce Subps., Ex. F ("PAC's Responses and Objections"), at 1–3.
[192] Nominal Def. Oracle Corp.'s Resp. to Lead Pl.'s Mot. to Enforce Subps. And Mot. for Protective Order Regarding Subps., D.I. 220 ("Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot for Protective Order"), Ex. A, at 2.

SLC to manage issues concerning attorney-client privilege, the work-product doctrine, or any other privilege any immunity that may arise from this litigation and to respond to subpoenas or other requests for information.[193]

The Lead Plaintiff filed the Second Amended Complaint on November 27, 2019.

*I. Procedural Background of the Discovery Motions*

The Subpoenas were served on the SLC and PAC on August 29, 2019. The SLC and PAC served their respective responses and objections to the Subpoenas on September 11, 2019. Defendants Ellison and Catz moved for a Protective Order, or in the Alternative, to Quash the Subpoenas on September 11, 2019.[194] Defendants Hurd and Henley joined the Motion on September 11, 2019,[195] and on September 12, 2019, Defendants Goldberg and Nelson joined the Motion.[196] On October 7, 2019, the Lead Plaintiff filed a Motion to Enforce the Subpoenas.[197] On October 21, 2019, Nominal Defendant Oracle moved for a Protective Order regarding the

---

[193] *Id.*

[194] Def.'s Mot. for a Protective Order or to Quash Subps., D.I. 171 ("Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps.").

[195] Joinder of Defs. Hurd and Henley in Mot. for Protective Order or to Quash Subps., D.I. 172 ("Joinder of Defs. Hurd and Henley in Mot. for Protective Order or to Quash Subps.").

[196] Def. Goldberg's Joinder to Mot. for Protective Order or to Quash Subps. D.I. 178 ("Def. Goldberg's Joinder to Mot. for Protective Order or to Quash Subps"); Joinder of Def. Nelson to Mot. for Protective Order or to Quash Subps., D.I. 185 ("Joinder of Def. Nelson to Mot. for Protective Order or to Quash Subps.").

[197] Lead Pl.'s Mot. to Enforce Subps.

Subpoenas.[198]  I heard Oral Argument on the cross-discovery Motions on November

7, 2019 and considered the Motions submitted for decision on that date.

## II. ANALYSIS

The issue before me is the following: which documents and communications

possessed by the SLC and PAC must be produced to the Lead Plaintiff?[199]  While

the question may seem simple on its face, crafting a coherent and administrable

response requires considering a web of evidentiary and privilege objections in light

of considerations of public policy and equity.  With this in mind, my analysis is

divided into two sections.  First, I demarcate the universe of documents and

communications to which the Lead Plaintiff is presumptively entitled.  I then

consider the privilege and other objections made by the Defendants and the SLC and

---

[198] Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot for Protective Order.

[199] In briefing disagreement arose as to whether the SLC and its counsel possessed the documents produced by Oracle.  Oracle noted in its Motion that "[t]he SLC cannot produce documents that it does not have" and that "the documents in Oracle's review database are not in the SLC's possession, custody, or control"  Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot for Protective Order, ¶¶ 18, 21.  The Lead Plaintiff countered, noting that "[t]he Oracle Motion repeatedly asserts that the SLC does not possess the documents Oracle produced to the SLC, even though Oracle made the documents available to the SLC on a discovery database hosted by an Oracle Discovery Vendor."  Lead Pl.'s Opp'n to Oracle Corp.'s Mot. for Protective Order to Limit Subps., D.I. 255, ¶ 8.  Mr. Moff noted in his affidavit that the SLC's counsel "have conveyed to Oracle's counsel that we expect Kramer Levin to have continued and unfettered access to the workspace pending a resolution of any motions related to Lead Plaintiff's outstanding subpoenas."  Moff Aff., ¶ 22.  Mr. Shannon of PAC represented at Oral Argument that the SLC continues to have access to the documents produced by Oracle and will be able to produce to the Lead Plaintiff any of the documents produced to it pursuant to my ruling on the Motions.  Nov. 7, 2019 Oral Arg. Tr., at 10:8–10:15, 61:7–61:10.  Therefore, for purposes of this Memorandum Opinion, I consider all documents and communications provided to the SLC in the course of its investigation in the possession of the SLC and its counsel.

determine which documents and communications may be withheld pursuant to valid objections. My reasoning is as follows.

> A. *The Lead Plaintiff is Presumptively Entitled to All Relevant Documents Considered by the SLC*

Chancery Court Rule 26(b)(1)[200] sets out the general principles of the scope of discovery in this Court. Unless limited by a Court order:

> Parties may obtain discovery regarding *any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case*, including the existence, description, nature, custody, condition and location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter.[201]

A recent comment to Rule 26(b)(1) notes that the 2019 amendment to the Rule "follows the Federal Rules of Civil Procedure in confirming that relevance is the touchstone for discovery. Under this standard, relevant evidence is discoverable, even if it may not be admissible."[202]

The Subpoenas and the Lead Plaintiff's contentions in briefing and at Oral Argument make clear that Lead Plaintiff seeks *all* documents and communications made available to the SLC in the course of its investigation. The Lead Plaintiff notes that it has "no desire to review irrelevant documents" but seeks all approximately 1.4 million documents made available to the SLC to "prevent Oracle and the

---

[200] Ch. Ct. R. 26(b).
[201] *Id.* (emphasis added).
[202] *Id.*

individual defendants from hiding documents produced to the SLC that the individual defendants consider harmful to their defense."[203] The Lead Plaintiff also argues that it is entitled to the entirety of the SLC's work product on efficiency grounds, because it allegedly "would be a mammoth, expensive, highly imperfect, and impossible undertaking to discover from adversaries information that the SLC has already assembled and holds at its fingertips."[204]

While the Lead Plaintiff has not stated so explicitly, in essence it is advocating I rule in this context that everything provided to or created by the SLC is "relevant," under Rule 26(b)(1). In the Lead Plaintiff's eyes, because "[t]he SLC's only purpose was to investigate the derivative claims," any documents they hold or created must be relevant to the Lead Plaintiff's own prosecution of the derivative claims.[205] In the Lead Plaintiff's conception, relevance should turn not on what the documents say but who holds them.

The Defendants, including Nominal Defendant Oracle, along with the SLC and its counsel, disagree. Defendants Ellison and Catz argue that the Defendants—not the SLC—should produce only "documents regarding the NetSuite transaction, documents regarding Oracle's valuation of NetSuite, and the like," contending that

---

[203] Lead Pl.'s Opp'n to Oracle Corp.'s Mot. for Protective Order to Limit Subps., D.I. 255, ¶ 11.
[204] Lead Pl.'s Mot. to Enforce Subps., ¶ 28.
[205] Lead Pl.'s Opp'n to Mot. of Defs. Ellison and Catz for Protective Order or to Quash Subps., D.I. 204, ¶ 23.

34

this constitutes the universe of relevant documents to this Action.[206] Furthermore, according to Ellison and Catz, the SLC's files "contain no unique documents" apart from those it created itself and therefore the Lead Plaintiff "has no need to obtain discovery from the SLC because it can gain access to any *relevant* documents through traditional, plenary discovery."[207] Oracle argues that the Lead Plaintiff is "not entitled to Oracle's irrelevant documents or Oracle's privileged documents."[208] In other words, the Defendants and Oracle argue that no documents reviewed by the SLC should be produced by the SLC to the Lead Plaintiff, which should proceed as though the SLC review had never occurred.

The Defendants response stems in part from the process Oracle used to identify documents ultimately provided to the SLC. Oracle contends that "[b]ecause the SLC members were Oracle directors . . . Oracle provided the SLC with documents through a process nothing like a typical litigation."[209] Oracle states that it "did not quibble about custodians" and "did not dispute the SLC's requested search terms; besides certain problematic terms."[210] Additionally, according to Oracle, "[o]nce the documents were collected, [Oracle] did not review them" and "did not

---

[206] Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps., ¶ 7.
[207] *Id.* ¶¶ 22, 36.
[208] Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot. for Protective Order, ¶ 13.
[209] *Id.* ¶ 5.
[210] *Id.*

35

screen the documents for relevance or privilege."[211] Oracle also notes that "[r]ather than produce its documents to the SLC, Oracle provided the SLC's counsel with access to its discovery database."[212] The SLC's access was protected, which did not allow Oracle to monitor which documents the SLC's counsel reviewed.[213]

Before addressing these disparate views, I note that the unusual posture of this case causes the issue here to diverge entirely from the type of discovery available to derivative plaintiffs in the more typical scenario following review by a special litigation committee. In that typical case, a special litigation committee has considered a cause of action that a stockholder-plaintiff proposed to pursue derivatively, and has decided—purportedly in its business judgment—that the litigation is contrary to the corporate interest. Special litigation committees, nominally independent of the conflicted board, as a practical matter may face influences that make such a determination unworthy of unreflective application of the business judgement rule. The putative derivative plaintiff, therefore, is entitled

---

[211] *Id.* ¶ 6. Oracle's counsel later clarified that emails and documents from Ellison's personal email account were personally reviewed by Oracle's General Counsel before being provided to the SLC but that "Mr. Ellison's documents—and only Mr. Ellison's documents—were screened before production and . . . some of those documents were removed as sensitive before the remaining documents were provided to the SLC." Letter of November 6, 2019, D.I. 256, at 3–4.

[212] Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot. for Protective Order, ¶ 7. While Oracle contends it did not produce documents to the SLC in the traditional sense, I find no practical difference between Oracle's process here and traditional document production, and use the terms "produce" and "provide" interchangeably herein.

[213] *Id.* ¶ 7 n.2.

to discovery of material sufficient to test whether the special litigation committee has applied its business judgement in the best interest of the entity.[214]

Here, such considerations are not applicable. The Lead Plaintiff, for obvious reasons, does not challenge the business judgment of the SLC that the Lead Plaintiff should pursue the cause of action here, and *Zapata*-style discovery is unnecessary. As laid out above, the parties differ fundamentally regarding on what basis the Lead Plaintiff's document demand should be addressed. Consideration of these divergent views requires a consideration of the nature of the litigation asset, and how it has been maintained.

The Lead Plaintiff argues that the proper point of reference for my review is the claims being litigated on the entity's behalf. The Lead Plaintiff insists that "[t]he SLC's counsel should share information with Lead Plaintiff's counsel just as if they were jointly litigating the claims on behalf of Oracle."[215] Pursuant to this interpretation, the Lead Plaintiff urges that it "must not be forced to start discovery from scratch, without the benefit of the work of the SLC's counsel."[216] If this is the case, the Lead Plaintiff implores, it would be akin to "deem[ing] the SLC's investigation a black hole—no light and no information can emerge from it."[217] This

---

[214] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788 (Del. 1981) ("First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquiries.").
[215] Lead Pl.'s Mot. to Enforce Subps., ¶ 27.
[216] *Id.* ¶ 26.
[217] *Id.* ¶ 4.

37

interpretation urges me to consider the claims akin to a baton, originally in the hands of Oracle itself, passed to the Lead Plaintiff via the denial of Ellison and Catz's Motion to Dismiss, then passed to the SLC, and now back in the hands of the Lead Plaintiff. According to the Lead Plaintiff, the information collected by the SLC in the course of its investigation should accompany the passing of the notional baton.

Rather than a baton, the Defendants view Oracle's creation of the SLC as equivalent to its hitting the "pause button"—the SLC's August 15 letter was thus akin to hitting the "play button" and plenary discovery should now proceed. Exemplifying the "play button" metaphor, Ellison and Catz contend that "[t]he SLC took no action adverse to Plaintiff's claims, instead allowing the Plaintiff to resume the litigation unimpeded."[218] The Lead Plaintiff's attempts to obtain discovery from the SLC are an "attempt[] to circumvent normal discovery practice," in the words of Oracle.[219] Neither the Defendants, nor Oracle, ascribe import to the fact that the Lead Plaintiff and the SLC were prosecuting the same claims. They contend that "neither Oracle's Board nor the SLC passed a resolution imbuing Plaintiff with the SLC's authority. The SLC merely declined to take action, which left the case in the Plaintiff's hands."[220] This, however, is a crabbed and, in my view, inaccurate

---

[218] Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps., ¶ 28.
[219] Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot. for Protective Order, ¶ 2.
[220] Defs. Ellison and Catz's Reply. in Support of its Mot. for a Protective Order or to Quash Subps., D.I. 243, ¶ 14.

description of the actions of the SLC, which in fact found the Lead Plaintiff the proper entity to pursue, on a fiduciary basis, monetization of the litigation asset.

The authority of a corporate board to litigate claims on behalf of a corporation is derived from Section 141(a) of the DGCL.[221] Even in circumstances such as this Action—where the requirement to make a litigation demand is excused under Chancery Court Rule 23.1—"the board entity remains empowered under [Section] 141(a) to make decisions regarding corporate litigation."[222] This authority is delegable to a special litigation committee pursuant to Section 141(c) of the DGCL.[223] The deference of Delaware law to the decisions of a special litigation committee "is among the many important policy choices that our state has made regarding the circumstances when it is appropriate to divest the board of directors of a Delaware corporation of a portion of its statutory authority to manage the corporation's affairs, *i.e.*, its right to control litigation brought on behalf of the corporation."[224]

Delaware law considers the control exercised by a corporate board over litigation as command of a corporate asset. In *In re Ezcorp Inc. Consulting Agreement Derivative Litigation*, this Court noted that a board or special litigation

---

[221] 8 *Del. C.* § 141(a); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 Del.C. s 141 (a).").
[222] *Zapata*, 430 A.2d at 786.
[223] 8 *Del. C.* § 141(c); *Zapata*, 430 A.2d at 786.
[224] *In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1212 (Del. Ch. July 10, 2002)

39

committee can "determine what action the corporation will take with its litigation assets, just as with other corporate assets."[225]  Furthermore, this Court in *Wenske v. Blue Bell Creameries, Inc.* remarked that "a special litigation committee of independent board members can assume the board's responsibility to decide how best to exploit a litigation asset."[226]

In light of Delaware law's consideration of litigation as a corporate asset, one may view adversarial derivative litigation as a struggle over control of that asset between a stockholder, proceeding derivatively, and the corporation's board.  I observed in *Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago v. Smith*:

> The answer to this conundrum [of how a conflicted board must handle a litigation asset] offered by our law is the derivative action, under which a stockholder is permitted to take control of the litigation asset and attempt to employ it on behalf of the corporation.  Looked at in this way, derivative litigation is a kind of necessary evil; because it departs from the fundamental tenet that the directors control the corporation and its assets, it must be employed only where the established corporate model cannot exploit, and risks forfeiting the value of, the litigation asset.  To ensure that derivative litigation is kept within the appropriate limited confines, our courts, through rules and case law, have established that a stockholder-plaintiff may proceed derivatively, and without a demand on the board of directors, but only where he pleads specific facts raising a reasonable doubt that the

---

[225] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at \*32 (Del. Ch. Jan. 25, 2016) (*citing Zapata*, 430 A.2d at 782).
[226] *Wenske v. Blue Bell Creameries, Inc.*, 214 A.3d 958, 965 (Del. Ch. Aug, 30, 2019) (*citing Zapata*, 430 A.2d at 786).

40

directors would be able to bring their business judgment to bear on behalf of the corporation, with respect to the litigation at issue.[227]

Employing an apt verb, Vice Chancellor Slights in *In re Clovis Oncology, Inc. Litigation* noted that "[t]o wrest control over the litigation asset away from the board of directors, the stockholder must demonstrate that demand on the board to pursue the claim would be futile such that the demand requirement should be excused."[228]

Recognizing the import of such tussles to the course of derivative litigation, this Court has spilled much ink dissecting when and under what circumstances a plaintiff may proceed derivatively notwithstanding a failure to make a litigation demand or, alternatively, when a board or a special litigation committee may rightfully command a litigation asset. Less attention has been paid to the character of litigation assets. This includes a feature especially pertinent here: how the value of a litigation asset—like any other corporate asset—may be increased by the efforts of corporate fiduciaries.

It is an accepted principle of Delaware law that the value of a derivative claim is derived primarily from the risk-adjusted recovery sought by the plaintiff.[229] It is likewise a core tenant of Anglo-American litigation practice that "[t]he success of a

---

[227] 2016 WL 3223395, at *1 (Del. Ch. May 31, 2016), *aff'd* 175 A.3d 621 (Del. 2017).
[228] 2019 WL 4850188, at *11 (Del. Ch. Oct. 1, 2019) (*citing Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004)).
[229] *In re Primedia, Inc. Shareholders Litig.*, 67 A.3d 455, 483 (Del. Ch. May 10, 2013); *Morris v. Spectra Energy Partners (DE) GP, LP*, 2019 WL 4751521, at *14 (Del. Ch. Sept. 30, 2019).

case depends upon preliminary factual investigation as much as any other facet of litigation practice."[230] The uncovering of facts unfavorable to a defendant increases the chances that a plaintiff will convince the trier of fact of a defendant's liability. Conversely, if after an investigation of facts a plaintiff concludes that a finding of liability is less likely, litigation may be rationally abandoned if the risk-adjusted recovery appears to be negative, net of litigation costs. It is with such an investigation that the SLC was charged by Oracle.

In the course of this litigation, the SLC enhanced the value of the derivative claims through its evaluation and investigation of the claims. The SLC Letter proclaimed that the SLC had "conducted *a thorough investigation and evaluation* of the claims raised in the derivative complaint."[231] The SLC Letter did not state whether the SLC created a draft or final report and PAC did not confirm or deny the existence of a report, in whatever form, at Oral Argument.[232] However, the SLC came to reasoned conclusions, namely that the "critical issue" of whether the NetSuite acquisition would be evaluated under the entire fairness standard would "most likely not be resolved prior to trial."[233] The SLC also pursued a settlement

---

[230] David F. Herr et al., *Fundamentals of Litigation Practice* § 3:4 (2019).

[231] SLC Letter, at 2 (emphasis added).

[232] Nov. 7, 2019 Oral Arg. Tr., at 66:4–66:7 ("The SLC's analysis, any draft report would be privileged as well; and the mediation materials, including we've already noted it's privileged."). Oracle's counsel likewise proffered at Oral Argument that he did not know whether a report existed. *Id*. at 35:20–35:22 ("Now, yes, if they had put documents into the report, if there were a report -- we don't know if there's a report -- if there were a report . . .").

[233] SLC Letter, at 2.

that "appropriately reflected the potential risks, advantages and disadvantages of further litigation."[234] When such a settlement proved unachievable, the SLC concluded that a dismissal of the derivative claims would not be in the best interests of Oracle.[235] The SLC acknowledged that its decision to allow the Lead Plaintiff to proceed with the litigation was founded on its investigation.[236] The SLC's conclusions and its evaluation of a risk-adjusted recovery are indicia of the value added to Oracle's litigation asset.

Having imbued the litigation asset with value, the SLC determined it was in Oracle's best interests for a different fiduciary—the Lead Plaintiff—to control the litigation asset. As a derivative plaintiff, the Lead Plaintiff "serves in a fiduciary capacity as representative of persons whose interests are in [its] hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity."[237] Lead Plaintiff's counsel emphatically affirmed its client's fiduciary capacity at Oral Argument.[238] Defendants Ellison and Catz counter that the SLC members "are corporate insiders with fiduciary duties, who can receive access to privileged or confidential information without fear of waiver or misuse. The same does not hold

---

[234] *Id.*

[235] *Id.*

[236] Resp. of the Special Litig. Comm. of the Bd. of Dirs. Of Oracle Corp. in Opp'n to Lead Pl.'s Mot. to Enforce Subps., D.I. 135, ¶ 1.

[237] *South v. Baker*, 62 A.3d 1, 21 (Del. Ch. Sept. 25, 2012) (*quoting In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129 (Del. Ch. Dec. 2, 1999)).

[238] Nov. 7, 2019 Oral Arg. Tr., at 83:20–83:22 ("Why don't we get to do targeted searches? That's the way litigation works. We'll sign a confidentiality order. We're fiduciaries.").

true for Plaintiff or its counsel."[239]  It is quite true that the breadth of fiduciary duties of the directors, the SLC members, and the Lead Plaintiff are not coextensive.  The SLC, however, was empowered to make a decision with respect to disposition of the litigation asset, and determined that Oracle's interests required it to be administered by the Lead Plaintiff *on behalf of Oracle.*

In sum, the SLC was given broad authority by Oracle's Board to "take any actions that [it] deem[ed] to be in the best interests of [Oracle] in connection with this lawsuit and any related matters."[240]  The SLC commenced an investigation whereby it and its counsel actually reviewed (at a minimum) tens of thousands of documents and interviewed thirty-four individuals.  The investigation enhanced the value of the litigation asset at, in the Lead Plaintiff's estimation, considerable expense.[241]  This value enhancement is evidenced by conclusions, derived from analysis of the factual record, made by the SLC and conveyed in the SLC Letter.  The SLC's investigation supported a conclusion that it was in Oracle's best interests that, rather than the SLC, the Lead Plaintiff be permitted to control the litigation

---

[239] Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps., ¶ 34 (*citing Kalisman v. Friedman*, 2013 WL 1668205, at *3–4 (Del. Ch. Apr. 17, 2013)).  I note that while concern exists that the documents and communications produced to the Lead Plaintiff may be sensitive in nature, I have entered an Order Governing the Production and Exchange of Confidential Information which will protect confidentiality interests.  Stipulation and Order Governing the Production and Exchange of Confidential Information, D.I. 267.

[240] Mot. to Stay, ¶ 9.

[241] Lead Pl.'s Mot. to Enforce Subps., ¶ 5 ("The SLC caused Oracle to pay many millions of dollars to law firms representing either the SLC or persons entitled to advancement.").

44

asset. The Lead Plaintiff seeks the documents produced to or created by the SLC in the course of its investigation, to pursue that litigation asset. In my view, it would be, at least in part, *against* Oracle's best interests to allow the Lead Plaintiff to proceed with the litigation asset stripped of all value created by the SLC. [242]

These considerations, however, do not exist in a vacuum. Those factors in favor of enforcing the Subpoenas must be weighed against the needs of special litigation committees to competently discharge their duties. Such discharge in turn relies on the candor and cooperation of the entity. In order to "conduct a good faith investigation of reasonable scope," Chancellor Chandler noted that a special litigation committee "must investigate all theories of recovery asserted in the plaintiffs' complaint" and "should explore all relevant facts and sources of information that bear on the central allegations in the complaint."[243] Special litigation committee members, such as those on the SLC here, are usually directors of the corporation and will likely be granted more generous access to corporate

---

[242] I note that Oracle's Board passed a written consent, discussed *supra*, on October 17, 2019 removing all of the SLC's authority besides, effectively, the ability to respond to subpoenas and manage issues concerning matters such as attorney-client privilege and the work-product doctrine. The removal of the SLC's authority after its designation of the Lead Plaintiff as the appropriate prosecutorial entity cannot affect my analysis here. The Lead Plaintiff's authority to pursue this litigation is not subsidiary to the SLC's own authority, but arises from its status as a stockholder of Oracle.

[243] *London v. Tyrrell*, 2010 WL 877528, at *17 (Del. Ch. Mar. 11, 2010) (*citing Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. Nov. 14, 1985); *Kaplan v. Wyatt*, 499 A.2d 1184, 1190–91 (Del. 1985)).

documents than a typical derivative plaintiff.[244]  Reflecting such access, Oracle has

submitted that the SLC had a "virtually unfettered right to information."[245]  A special

litigation committee may use this preferential access to discharge its duties in an

efficient and effective manner.  This inures to the benefit of the corporation, whether

by quick elimination of meritless suits or the designation of suits as meritorious.

Allowing complete discovery of *all* documents provided to or created by a special

litigation committee in situations such as these, as requested by the Subpoenas, could

chill candor and access and limit the effectiveness of special litigation committees

going forward.[246]

---

[244] *See Kalisman v. Friedman*, 2013 WL 1668205, at *3 (Del. Ch. Apr. 17, 2013) (*quoting Schoon v. Troy Corp.*, 2006 WL 1851481, at *1 n.8 (Del. Ch. June 27, 2006)) ("A director's right to information is 'essentially unfettered in nature.'").

[245] Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot. for Protective Order, ¶ 1.

[246] I note that the Lead Plaintiff and the Defendants have identified no case pertinent to the issues here, where a special litigation committee has found that it is in the best interests of the corporation for a particular derivative plaintiff to proceed with the litigation.  My research has uncovered only two other actions in this Court with a similar course of events.  In *In re American International Group, Inc.*, then-Vice Chancellor Strine noted that "[t]his litigation was stayed for eighteen months while the investigation was conducted.  In the end, the SLC chose to take a fragmented approach.  It decided to pursue claims against Greenberg and Smith on its own, seek the dismissal of certain other defendants, and take no position on the claims against the remaining defendants." 965 A.2d 763, 775 (Del. Ch. Feb. 10, 2009).  The second case, *Kaplan v. Peat, Marwick, Mitchell & Co.*, was the only existing case identified by then-Vice Chancellor Strine in *AIG* where a board had refused to take a position on derivative litigation.  *Id*. at 809 (citing *Kaplan*, 549 A.2d 726, 731 (Del. 1988)).  I have found no other cases.  *AIG* and *Kaplan* stand for the proposition that when "a corporate board has had the chance to consider what position to take regarding a derivative suit and has decided to take no position . . . [d]emand . . . is excused, and the derivative plaintiff is free to proceed against the defendants under the procedural rules ordinarily applicable."  *Id*. at 811. However, neither case mentions a discovery quandary similar to what is presented by the parties here, and notably, in those cases the respective special litigation committees took *no position* whereas here the SLC concluded it was in Oracle's best interests for the Lead Plaintiff to take control of the litigation.

Recognizing the Lead Plaintiff's equitable arguments in favor of production of all documents made available to the SLC, but aware of the potentially negative implications of such a ruling, I look to Rule 26 for guidance. As noted above, the "touchstone" of Rule 26 is "relevance." The Lead Plaintiff is only entitled to "relevant" documents or communications provided to the SLC, notwithstanding its equitable argument for access to all documents and communications. It is quite clear that giving the Lead Plaintiff free access to the virtually unlimited universe of corporate documents made available to the SLC would require production of much material not relevant to the litigation asset. Under these circumstances, what does due consideration of the boundaries of relevance require? Fortunately, the SLC itself necessarily, through counsel, separated, presumably, the ore of relevance from the overburden of available but irrelevant material. Those documents so screened, or created therefrom, form a handy proxy for identifying relevant documents. I find that the Lead Plaintiff is presumptively entitled to the production of all documents and communications actually reviewed and relied upon by the SLC or its counsel in forming its conclusions that (i) it would not be in Oracle's best interests to seek to dismiss the derivative claims and (ii) it was in Oracle's best interests to allow the Lead Plaintiff (rather than the SLC) to proceed with the litigation on behalf of Oracle. The SLC and its counsel are in the best position to identify which documents and communications fit this criteria and must therefore identify and produce such

47

documents to the Lead Plaintiff. This universe of documents to which the Lead Plaintiff is presumptively entitled is subject to, and limited by, the objections raised and considered, *infra*.

Below, I address the objections of the various Defendants and the SLC to specific categories of documents and communications within the universe of the material I have held otherwise subject to production. Before moving on, however, I consider here the Nominal Defendant's argument that communications it is entitled to withhold from third parties as attorney-client privileged retain that protection with respect to the Lead Plaintiff.[247] The attorney-client privilege "generally protects the communications between a client and an attorney acting in his professional capacity . . . ."[248] The privilege is "intended to encourage full and frank communication between clients and their attorneys" and its common-law roots are now codified in Rule 502 of the Delaware Rules of Evidence.[249] The attorney-client privilege applies to confidential communications between an attorney and her client "made for the purpose of facilitating the rendition of legal professional legal services."[250] The privilege "is the privilege of the client and not the privilege of the attorney."[251] Thus,

---

[247] Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot. for Protective Order, ¶¶ 28–36.
[248] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010) (*citing Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992)).
[249] *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993); D.R.E. 502.
[250] D.R.E. 502(b).
[251] *In re Kennedy*, 442 A.2d 79, 92 (Del. 1982) (*citing Riggs Nat'l Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 713 (Del. Ch. Apr. 9, 1976)).

the privilege belongs to Oracle—the entity—which necessarily acts through its fiduciaries.

Oracle's first argument—that the vast tranche of its documents made available to the SLC undoubtedly contains irrelevant privileged material[252]—is mooted by my restriction of production to relevant material, as described above. The question here is more limited: where the SLC has relied upon Oracle's privileged documents to reach its decision that it is in Oracle's best interests for the Lead Plaintiff to litigate this matter, should those documents nonetheless be withheld from the Lead Plaintiff as they would be from a third party?

In addressing that question, the Lead Plaintiff contends that it is entitled to Oracle's privileged documents under the *Garner*[253] exception endorsed by our Supreme Court in *Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund IBEW*.[254] Oracle counters that *Garner* does not apply, and, that the Lead

---

[252] Oracle argues that certain documents it produced to the SLC, which included more than 400,000 marked "potentially privileged," are subject to Oracle's attorney-client privilege and should be shielded from production. Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot for Protective Order, ¶ 28.

[253] *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).

[254] 95 A.3d 1264, 1280 (Del. 2014). Lead Plaintiff's counsel also argued at Oral Argument that the October 17, 2019 written consent, discussed *infra*, deprived Oracle of the "authority" to file its Motion for Protective Order. Nov. 7, 2019 Oral. Arg. Tr. at 11:15–12:1. In separate briefing after Oral Argument, the Lead Plaintiff elaborated that though "the SLC relinquished certain authority to the Board, the SLC expressly retained the authority to 'manage issues concerning attorney-client privilege . . . and/or . . . respond to any subpoena.'" Lead Pl.'s Reply in Further Support of its Mot. for Sanctions, D.I. 269, ¶ 8. For purposes of this Memorandum Opinion, I assume without deciding that Oracle retains authority to raise its own privilege.

49

Plaintiff does not meet *Garner*'s criterion in any event.[255] *Garner* recognized a fiduciary exception to the attorney-client privilege in the corporate context. The *Garner* court held that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance."[256] In *Ryan v. Gifford*, Chancellor Chandler stressed three primary factors this Court considers in producing otherwise privileged communications under *Garner*: "(i) whether the claim is colorable; (ii) the necessity or desirability of information and its availability from other sources; and (iii) the extent to which the information sought is identified as opposed to blind fishing expedition."[257] Our Supreme Court has held that the "*Garner* doctrine fiduciary exception to the attorney-client privilege is narrow, exacting, and intended to be very difficult to satisfy."[258]

While the *Garner* doctrine is narrow, the *Garner* decision itself provides a broad analysis. The court first notes that evidentiary privileges are subject to a

---

[255] Nov. 7, 2019 Oral Arg. Tr., at 50:15–50:16; Oracle Corp.'s Resp. to Mot. to Enforce Subps. and Mot. for Protective Order, ¶¶ 32–36.

[256] *Garner*, 430 F.2d at 1103–1104.

[257] 2007 WL 4259557, at *3 n.4 (Del. Ch. Nov. 30, 2007) (*citing Sealy Mattress Co. of New Jersey v. Sealy, Inc.*, 1987 WL 12500, at *4 (Del. Ch. June 19, 1987)).

[258] *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1278 (Del. 2014).

balance of harms.[259]  With respect to the attorney-client privilege in the context of typical adversary litigants, the harm of vitiating the privilege—chilling candor between lawyer and client—outweighs any interest of the litigants in receiving the communications.  The need for unfettered communication between attorney and client is so fundamental to the administration of justice that the privilege is, effectively, absolute.  The *Garner* court, however, recognized that the identity of the parties may require a different conclusion.  Under the *Garner* doctrine, an exception to the absolute privilege exists "in order to prove fiduciary breaches by those in control of the corporation upon showing good cause."[260]  *Garner* is pertinent where the advice has been rendered to fiduciaries, who are asserting the privilege over that advice—received in the course of their fiduciary service—against the stockholder-plaintiffs themselves.  In such a situation, *Garner* requires the fiduciaries' judgment to invoke privilege to "stand on its merits, not behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised."[261]  To allow the privilege as a shield to the

---

[259] *Garner*, 430 F.2d at 1101 ("The problem before us concerns Wigmore's fourth condition, a balancing of interests between injury resulting from disclosure and the benefit gained in the correct disposal of litigation.  We consider it in a particularized context: where the client asserting the privilege is an entity which in the performance of its functions acts wholly or partly in the interests of others, and those others, or some of them, seek access to the subject matter of the communications.").  Our Supreme Court has termed it "a proper balance between legitimate competing interests."  *Wal-Mart*, 95 A.3d at 1278.

[260] *Wal-Mart*, 95 A.3d at 1276.

[261] *Garner*, 430 F.2d at 1101.

fiduciaries, where the stockholder-plaintiffs have shown sufficient need, fails the essential balance of harms.

This matter is not under the *Garner* doctrine, as such. At this stage of the proceedings it is unclear what if any privileged materials were reviewed by the SLC, let alone whether the Lead Plaintiff could establish the "narrow and exacting" conditions sufficient to vitiate the privilege under the doctrine as it is applied by our courts. However, my inquiry here is informed by the analysis done by the *Garner* court itself, which includes the balance of the harms and the recognition that common interests must inform such a balance. In the typical *Garner* situation, the court is not in position to make a determination that the maintenance of the suit is in the corporate interest; the company and its fiduciaries, on one hand, and the derivative plaintiff, on the other, are adversaries. Nonetheless, the identity of interest in the litigation asset and the fiduciary nature of the parties' relationship is sufficient to allow the balance to weigh in favor of disclosure where good cause is shown.

Here, to my mind, the identity of interests among Oracle, its SLC and the Lead Plaintiff is much closer. Oracle chose to establish the SLC, and to provide it with documents, perhaps including privileged documents, for the purpose of deploying the litigation asset. The SLC, based on its review of the documents, found it in the corporate interest for the litigation to be prosecuted, not by the SLC, but by the Lead Plaintiff. Surely, the attorney-client privilege has great utility to corporate managers

52

seeking to freely communicate with counsel. Oracle determined, nonetheless, that its interest in having the SLC evaluate and deploy the litigation asset via those communications outweighed the harm of disclosing any privileged communications to the SLC. Oracle has not advanced a single reason why, in its business judgment, the corporate interest in non-disclosure of those same communications to the Lead Plaintiff outweighs its interest in vindication of the asset. In these circumstances, I find that privileged communications given by Oracle to the SLC, *and* relied upon by the SLC in concluding that litigation by the Lead Plaintiff is in the corporate interest, must be produced to the Lead Plaintiff.[262]

### B. Objections

The Lead Plaintiff's entitlement to the documents and communications identified above is subject to any valid privileges and objections raised by the individual Defendants and the SLC.[263] Where a valid objection has been raised as to a class of documents and/or communications, production pursuant to the Subpoenas is not required notwithstanding that they are documents and/or communications to which the Lead Plaintiff is presumptively entitled.

---

[262] It is unclear if Oracle asserts work product immunity over some unidentified documents as well. To the extent it does, and to the extent the argument is not waived, the same rationale would apply. *See generally Wal-Mart*, 95 A.3d at 1280–1281 (affirming this Court's use of the "same reasoning [as with a Garner analysis] for its decision regarding the work-product doctrine.").

[263] Along with its counsel, PAC.

Like Oracle itself, many of the individuals and entities involved in this litigation objected to the production of certain documents based on attorney-client privilege.[264] In their general and specific objections to the Subpoenas, the SLC and PAC made this objection.[265] Furthermore, in their respective motions for (and joinders to) protective orders Defendants Ellison,[266] Catz,[267] Hurd,[268] Henley, [269] Goldberg,[270] and Nelson[271] sought to prevent production of documents covered by their respective attorney-client privilege.

Objections to the Subpoenas were also raised under the work-product doctrine. The purpose of the work-product doctrine is "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent"[272] Work product protection emanates from

---

[264] Defendants also sought protective orders under theories such as "spousal" privilege and under the generic category of "privilege." NetSuite Defs.' Reply in Support of Mot. for Protective Order or to Quash Subps., D.I. 240 ("NetSuite Defs.' Reply in Support of Mot. for Protective Order or to Quash Subps."), ¶ 7; Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps., ¶ 4.

[265] In both parties' general objections to the Subpoenas: "[t]he Subpoena improperly seeks the production of privileged material, including but not limited to communications between the SLC and its counsel . . ." SLC's Responses and Objections, at 2; PAC Responses and Objections, at 2. In both parties' specific objections to the Subpoenas: "objects to this Request to the extent that it . . . seeks information protected by the attorney-client privilege . . ." SLC's Responses and Objections, at 5–6; PAC Responses and Objections, at 5–6.

[266] Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps., ¶31.

[267] *Id.*

[268] Joinder of Defs. Hurd and Henley in Mot. for Protective Order or to Quash Subps., at 1–2.

[269] *Id.*

[270] Def. Goldberg's Joinder to Mot. for Protective Order or to Quash Subps., at 1.

[271] Joinder of Def. Nelson to Mot. for Protective Order of to Quash Subps., at 1.

[272] *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *3 (Del. Ch. Nov. 13, 2002) *(quoting United States v. AT&T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).

Chancery Court Rule 26(b)(3) under which a party may obtain discovery of materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . *only* upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[273]   To qualify for work product immunity "materials [must] be written specifically in preparation for threatened or anticipated litigation."[274]   Like their invocation of the attorney-client privilege, the SLC and PAC objected to the Subpoenas based on work product protection.[275]

### 1. The Individual Defendants

All of the individual Defendants other than the outside Oracle directors have objected to the Subpoenas to the extent that they request documents subject to the attorney-client privilege, and other privileges, of individual Defendants.  Ellison and Catz submit that "[t]here are undoubtedly many irrelevant and privileged documents in the SLC's database, including private communications between Defendants and

---

[273] Ch. Ct. R. 26(b)(3) (emphasis added).

[274] *Zirn v. VLI Corp.*, 621 A.2d 773, 782 (Del. 1993) (*citing Riggs Nat'l Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 715 (Del. Ch. Apr. 9, 1976)).

[275] In the both parties' general objections to the Subpoenas: "[t]he Subpoena improperly seeks the production of privileged material, including but not limited to . . . work product . . ."  SLC's Responses and Objections, at 2; PAC Responses and Objections, at 2.  In both parties specific objections to the Subpoenas: "objects to this Request to the extent that it . . . seeks information protected by the . . . work-product doctrine . . ."  SLC's Responses and Objections, at 5–6; PAC Responses and Objections, at 5–6.

their family friends, and personal advisors having nothing to do with the NetSuite transaction."[276] The NetSuite Defendants raise concerns specific to them, namely that unlike Ellison and Catz, who "'oversaw the negotiation of search protocols with the SLC,'" the NetSuite Defendants "were not defendants at the time the SLC did its work, were not the subject of the SLC's investigation, and are not alleged to have played any role in Oracle's decision to include NetSuite legacy emails in the database."[277] Henley and Hurd argue that they "were not given any opportunity to negotiate the search terms applied to review their custodial files or to review the documents prior to production to the SLC."[278]

The reasoning supporting production to the Lead Plaintiff of Oracle's privileged documents does not apply to the individual Defendants. To name two obvious reasons for the difference: (1) the Lead Plaintiff is not a fiduciary of the individual Defendants and (2) nobody acting on behalf of the individual Defendants concluded it was in the individual Defendants' best interests that the Lead Plaintiff assume control of the litigation.

However, the individual Defendants' contentions that documents and communications should be withheld on privilege grounds is subject to argument that

---

[276] Defs. Ellison and Catz's Mot. for a Protective Order or to Quash Subps., ¶ 31.
[277] NetSuite Defs.' Reply in Support of Mot. for Protective Order or to Quash Subps., ¶ 3.
[278] Reply of Defs. Hurd and Henley in Support of Mot. for Protective Order or to Quash Subps., D.I. 242, at 2.

any privilege has been waived. Assertions of privilege are subject to waiver challenges because "[i]t is clear that the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications."[279] The individual Defendants contend that provision of their privileged communications by Oracle to the SLC did not constitute of waiver of any privilege of the individual Defendants that may have existed.

A similar but discrete argument is that any emails on Oracle's email servers are not privileged to begin with. *In re Information Management Services, Inc. Derivative Litigation* confronted whether company executives' communications with personal lawyers and advisors using work email accounts were outside the privilege, because they were not "confidential communications" within the meaning of Rule 502 of the Delaware Rules of Evidence. This Court applied the *Asia Global*[280] factors to conclude that the executives "cannot invoke the attorney-client privilege for communications exchanged with their personal attorneys and advisors using their work email accounts."[281]

*In re Information Management Services, Inc. Derivative Litigation* ends with a "Cautionary Note" that the opinion only addressed "the case before it" and that it

---

[279] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992) (*citing* D.R.E. 510; *Texaco, Inc. v. Phoenix Steel Corp.*, 264 A.2d 523 (Del. Ch., Mar. 24, 1970)).
[280] *In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005).
[281] *In re Info. Mgmt. Servs., Inc. Derivative Litig.*, 81 A.3d 278, 296 (Del. Ch. Sept. 5, 2013).

was "far from clear whether a court would analyze privilege similarly in a more traditional derivative action involving a stockholder plaintiff with a relatively nominal stake and a board comprising individuals without any affiliation with the suing stockholder."[282]  The intent of the "Cautionary Note" was to "emphasize that this decision does not purport to announce a rule applicable to all derivative actions, and it should not be interpreted as doing so."[283]

On aspect of *In re Information Management Services, Inc. Derivative Litigation* that undoubtedly differs from the instant cross discovery Motions is the concrete nature there of the communications over which privilege was claimed.  The defendants there prepared a privilege log that identified 362 emails and attachments.[284]  The individual Defendants here have not claimed privilege over any specific communication, nor have many of them had the opportunity to do so.  Instead, the parties cite to the volume of documents provided—approximately 1.4 million-plus in total, 400 thousand-plus marked "potentially privileged," 200 thousand-plus from Hurd and Henley alone—and contend that there might be privileged documents in that mass.

The issues of privilege raised by the individual Defendants are necessarily fact-specific and cannot be decided on the limited record currently before me.

---

[282] *Id*. (*citing Paramount Commc'ns Inc. v. QVC Network Inc*., 637 A.2d 34, 51 (Del. 1994)).
[283] *Id* at 296.
[284] *Id*.

58

Therefore, subsequent to the SLC and PAC's identification of the documents and communications within the scope of Section II.A of this Memorandum Opinion, but prior to production to the Lead Plaintiff, the individual Defendants shall be given an opportunity to review the documents the SLC and PAC intend to produce. The individual Defendants may then produce a privilege log of communications to which they claim privilege. If any such communications exist, I will address the privilege claims at that point, with the benefit of a more developed factual record.[285]

2. The SLC[286]

The SLC is the holder of the attorney-client privilege, and controls the work product protection, of its own documents and communications.[287] The SLC has apparently determined in its business judgment not to share such privileged and protected documents with the Lead Plaintiff. The SLC, a committee of Oracle's

---

[285] I note that a number of the individual Defendants also argued that production of all approximately 1.4 million-plus documents and communications to the SLC would implicate privacy concerns. *E.g.* NetSuite Defs.' Reply in Support of Mot. for Protective Order or to Quash Subps., ¶ 7 ("[r]egular discovery . . . would enable the NetSuite Defendants to review and determine whether any responsive emails fall within their . . . spousal or other privileges or personal privacy concerns."). I am skeptical that any such private documents or communications would fit within the criteria of Part II.A of this Memorandum Opinion and therefore anticipate that this issue is moot. However, if upon review of the SLC and PAC's intended production, any individual Defendant identifies documents or communications that should not be produced pursuant to Rule 26 (when read together with this Memorandum Opinion) they are free to log such documents or communications for review.

[286] Because PAC is counsel to the SLC, this section applies to PAC as well.

[287] *See Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1996 WL 307444, at *6 (Del. Ch. June 4, 1996) ("[The board] could have acted, pursuant to 8 Del.C. § 141(c) . . . to appoint a special committee empowered to address in confidence those same matters . . . the special committee would have been free to retain separate legal counsel, and its communications with that counsel would have been properly protected from disclosure . . . .").

Board constituted under Section 141(c) of the DGCL, is distinct from Oracle, the constituent corporation. Thus, the Lead Plaintiff cannot compel production of such documents under the reasoning I have applied to Oracle's own documents.

To the extent that the Lead Plaintiff invokes the common-interest doctrine as a basis to compel production from the SLC, I find this argument misplaced. The common-interest doctrine "allows separately represented clients sharing a common legal interest to communicate directly with one another regarding that shared interest," without that communication resulting in a waiver of the privilege as to third parties.[288] The common-interest doctrine, thus conceived, is a shield to waiver—not a sword to obtain production—and it does not aid the Lead Plaintiff here. Some authorities suggest that common-interest clients represented by a single counsel may not assert the privilege against their fellow interest holder, but those circumstances are absent here.[289]

Nor is it appropriate to abrogate the SLC's attorney client privilege and work product protection on the grounds of "efficiency" as the Lead Plaintiff urges. It may be that without the benefit of such documents, the Lead Plaintiff is forced to replicate the SLC's work at great expense. It is also likely that the SLC's privileged and protected documents add value to the derivative claims that could aid the Lead

---

[288] *Glassman v. Crossfit, Inc.*, 2012 WL 4859125, at *3 (Del. Ch. Oct. 12, 2012) (*citing Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 2011 WL 532011, at *4 (Del. Super. Feb. 2, 2011)).
[289] *See Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970).

Plaintiff's prosecution of this Action. However, Delaware law does not recognize an "efficiency exception" to the attorney-client privilege or work-product doctrine. Furthermore, at this moment, the Lead Plaintiff has not made the required showing under Rule 26(b)(3) that it is unable to obtain the substantial equivalent of the SLC's work product by other means without undue hardship.

Finally, the Lead Plaintiff suggests that it may be a breach of fiduciary duty for the SLC to withhold privileged and protected documents and communications from the Lead Plaintiff. That question is not currently before me and I will not address it on this record. However, the SLC shall produce to Lead Plaintiff a log of all documents it is withholding on privilege or immunity grounds.

The Lead Plaintiff lacks a legally cognizable basis to compel production of the SLC's documents and communications subject to privilege and work product protection at this time. To the extent the Subpoenas request such information, the Lead Plaintiff's Motion is denied without prejudice.

### 3. Mediation Materials

The SLC and PAC, along with other parties, expressed concern that the Subpoenas seek the production of the SLC and PAC's mediation materials in violation of Chancery Court Rule 174(h).[290] The Rule states that "[m]ediation

---

[290] Ch. Ct. R. 174(h). The SLC and PAC generally objected to the Subpoenas "to the extent [they] call[] for the disclosure of confidential information shared or obtained in the course of mediation, including confidential mediation statements, or other confidential settlement communications

61

proceedings are not subject to discovery" but that this limitation "shall not extend to the mediation agreement, any settlement agreement, any evidence provided to the mediator or exchanged in the mediation that otherwise would be subject to discovery, and any memoranda, reports, or other materials provided to the mediator or exchanged in the mediation that were not prepared specifically for use in the mediation."[291]   To the extent that any documents or communications would be subject to production under this Memorandum Opinion but are exempt from discovery under Chancery Court Rule 174(h) they are not required to be produced.

## III. CONCLUSION

For the foregoing reasons the Lead Plaintiff's Motion is granted in part and denied in part.   Nominal Defendant Oracle's Motion is denied.   Ellison's, Catz's, Hurd's, Henley's, Goldberg's, and Nelson's Motions are deferred.   The parties should submit an Order consistent with this decision.

---

protected from disclosure."   SLC's Responses and Objections, at 3–4; PAC Responses and Objections, at 3–4.
[291] Ch. Ct. R. 174(h).